In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-4195

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS MIRANDA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 787—**Samuel Der-Yeghiayan,** *Judge.*

ARGUED JUNE 1, 2007—DECIDED OCTOBER 26, 2007

Before FLAUM, MANION and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Luis Miranda pled guilty to one count of bank robbery, in violation of 18 U.S.C. § 2113(a). Miranda has a history of severe mental illness, and at sentencing, he presented considerable evidence of diminished capacity. Miranda also presented evidence in support of an argument that his criminal history category overstated the nature of his prior criminal history. He argued to the district court for a below-guidelines sentence based on several factors listed in 18 U.S.C. § 3553(a). The district court did not directly address these non-frivolous arguments and sentenced Miranda to fifty months of imprisonment, a sentence greater than the government requested. Because the district court did not

address Miranda's principal, non-frivolous arguments
before sentencing, we vacate and remand for resentencing.

**I.**

On September 12, 2005, Miranda walked into the
Amcore Bank in Carpentersville and handed the teller a
note. The note warned the teller not to activate the silent
alarm and threatened that she had a limited number of
seconds to hand over the money. The note also indicated
that Miranda had a gun pointed at the teller and that he
had a bomb.[1] The teller handed Miranda all of the cash
in her drawer, approximately $4,045.00. Miranda placed
the money in his backpack and walked out of the bank.
The next day, his wife saw a picture of the robber in a local
newspaper and immediately recognized the man in a
baseball cap and sunglasses as her husband. She called
him, told him about the newspaper photo and then called
the police.

This was not the first time that Melissa Miranda had
been compelled to call the police regarding her husband's
strange behavior. Miranda had been telling his wife
for years that he heard voices and that he saw reflec-
tions in her eyes of people lurking behind him. He be-
lieved that these people wanted to hurt him. The voices
he heard sometimes directed him to do specific things,
and sometimes told him to hurt himself. Miranda also
thought that others could hear his thoughts. He saw
shadows that told him things about his wife. Miranda had
twice attempted suicide, once with a gun and once by
dousing himself in gasoline and attempting to light him-
self on fire. During the incident with the gun, Melissa
Miranda called the police, fearing for her husband's life.

---

[1]  As far as we can tell from the record, he had neither.

The police officers took Miranda to a hospital where he was admitted for a psychotic disorder. Because his firearm owner's identification card had expired, the police later returned to arrest him for illegal possession of the gun he used in his suicide attempt. When the police arrested Miranda for this offense, they discovered a crack pipe and a small amount of cocaine on his person and charged him with both unlawful possession of a firearm and possession of a controlled substance. Miranda pled guilty to both of these offenses, which comprised the entirety of his criminal history prior to the bank robbery.

Miranda pled guilty to the bank robbery as well. In light of Miranda's earlier mental health issues, his counsel petitioned the district court to appoint a psychiatrist to examine him. The court appointed Dr. Daniel Yohanna, an associate professor of psychiatry at the University of Chicago. Dr. Yohanna, who is board certified, has vast experience in psychiatric practice, teaching and publishing. Dr. Yohanna reviewed Miranda's prior medical records and prior extensive psychiatric records. He examined Miranda and also reviewed both the Presentence Investigation Report ("PSR") prepared by a probation officer and Miranda's plea agreement. He wrote his initial report from these sources but prior to the sentencing hearing, he also had an opportunity to speak with Melissa Miranda about her husband's behavior.

In the initial report, Dr. Yohanna concluded that Miranda suffers from Schizoaffective Disorder and that he suffered from that disorder at the time he committed the offense of conviction. Dr. Yohanna noted that Miranda had a history of depression and other mental health conditions since he was a child but had not received any

treatment until 2003.[2] At that time, he was hospitalized for auditory hallucinations and substance abuse. Miranda was hospitalized five more times for psychiatric conditions in the next two years, including two hospitalizations for suicide attempts. Miranda was treated on an outpatient basis for the three years prior to the bank robbery, and was taking six medications relating to his mental health and medical conditions at the time Dr. Yohanna examined him. He had taken other psychiatric medications over the years as well. His medications included antipsychotic agents, mood stabilizers, anti-anxiety medications, pain medication, antidepressants, and drugs that served as substitutes for heroin. The record does not indicate which medications Miranda was taking at the time of the robbery. Miranda's history of substance abuse (cocaine and heroin) was extensive, but by the time Dr. Yohanna examined him, no illegal drugs had been detected in his system for more than a year.

Dr. Yohanna's primary diagnosis was, as we noted, Schizoaffective Disorder. He also diagnosed cocaine dependance, in remission, and opiate dependence, in remission. Schizoaffective Disorder is marked by an uninterrupted period of illness during which, at some time, there is a Major Depressive Episode, a Manic Episode or a Mixed Episode concurrent with symptoms

---

[2] When Miranda's brief was filed earlier this year, he was 38 years old and had been married to Melissa Miranda since 1993. They have two sons, aged 15 and 8. At the time of the offense, Miranda was working for a trucking company. According to the opening brief, Miranda's mother is 52. By our calculations, Miranda's mother was approximately 14 years old when Miranda was born. Miranda was sexually abused as a child by persons close to his family, and as a teenager, he suffered serious injuries in an auto accident that left him in a wheelchair for two years.

of Schizophrenia.[3] Dr. Yohanna opined that Miranda met the criteria for Schizophrenia because Miranda experienced auditory hallucinations and displayed a blunted affect. Miranda also met the criteria for Major Depression because he suffered from a depressed mood, diminished interest and pleasure in his activities, psychomotor agitation, decreased sleep, and suicide attempts. According to Dr. Yohanna:

> Mr. Miranda understands the nature of his crime and has pleaded guilty to the charges; however he was hallucinating at the time of the crime. This symptom has been persistent since its onset in 2003 and the description of the hallucination that is being intermittent throughout the day, being an unrecognizable but discernable, single, male voice, is consistent with real disease as well as the partial response to medication. The evidence against the diagnosis of schizophrenia is that there are no corresponding delusions which occur in most patients with hallucinations. It is also then my opinion with the necessary degree of psychiatric certainty that Mr. Miranda is not malingering.

R. 55, at 7. After speaking to Melissa Miranda, Dr. Yohanna supplemented his report. This conversation confirmed for Dr. Yohanna that his original diagnosis was correct and removed any doubt caused by the absence of any reported delusions:

> [Melissa Miranda] stated that Mr. Miranda began to experience delusions and auditory hallucinations

---

[3] These capitalized terms are defined terms in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, commonly referred to as the DSM-IV. The DSM-IV is the most widely used psychiatric reference book in the world, according to its publisher, the American Psychiatric Association.

beginning in February 2001. She describes a signifi-
cant disturbance where he believed that people were
talking from under or in the bed. She would come
home to find that he emptied drawers or tore open the
mattress looking for the source of voices. He also was
paranoid[,] complaining that people were out to harm
him and seeing people behind him in the reflection of
her eyes. This made it clearer that Mr. Miranda
suffered from not only auditory hallucinations but
delusions, which is more common in the diagnosis of
schizophrenia. This confirms my opinion with the
necessary degree of medical certainty that Mr.
Miranda suffers from Schizoaffective Disorder. Also
that he was suffering from this disorder at the time
of the offense in September of 2005 displaying symp-
toms including auditory hallucinations and delusions.

R. 57. Both the original report and the supplement were
presented to the district court prior to the sentencing
hearing.

In addition, Dr. Yohanna testified at the sentencing
hearing, where he explained that, at the time of the
robbery, Miranda was experiencing auditory command
hallucinations. In other words, Miranda heard a voice
telling him that "we need money" and that he should rob
a bank. Dr. Yohanna described schizophrenia as a
disease of the brain and explained that when a person
with schizophrenia hears voices, it is because the area
of the brain that processes hearing is stimulated even
though there is no external stimulus. As a result, that
person "hears" a voice in the same manner another person
would hear a voice when someone actually speaks. To a
schizophrenic, an auditory hallucination sounds no differ-
ent than normal speech. As Dr. Yohanna framed the issue,
"[T]here's no real sound happening but your brain is
actually firing like there is a sound." R. 68-1, at 15-16.
After receiving treatment in prison while awaiting sen-

tencing, Miranda began to understand that his visual and auditory hallucinations were part of a brain disease, but before that time, he experienced the hallucinations as real events. Dr. Yohanna also testified that the auditory hallucinations were caused not by drug use but by the separate medical condition of schizophrenia. R. 68-1, at 17. Moreover, Dr. Yohanna opined that Miranda was responding to command hallucinations at the time he committed this crime. R. 68-1, at 18. Finally, Dr. Yohanna testified that, as between drugs use and schizophrenia, "the primary thing [Miranda] was responding to were the hallucinations but drugs will also reduce your inhibitions and may contribute to impulsive acts." R. 68-1, at 19. *See also* r. 68-1, at 20 ("I thought that what was driving him was the schizophrenia more than the drug use so that's what I thought was the predominant disease driving him.").

After Dr. Yohanna's testimony, Miranda himself testified about the circumstances of his earlier firearms and drug convictions. He explained that, in 2004, he told his wife he was going to kill himself with a gun, that she called the police and that they came to his home and took the gun from him. The police officers then took him to a hospital where he was admitted for psychiatric treatment. Approximately one month later, the officers returned to his home to arrest him because his FOID card had expired and his gun possession was thus illegal. When the officers arrested and searched Miranda on the gun charge, they found a few grams of cocaine on his person, and he was charged with drug possession as well. Miranda also testified about his subsequent attempt to kill himself by dousing himself with gasoline and attempting to set himself on fire. This incident came approximately six months after the first suicide attempt.

Counsel for Miranda argued for a below-guidelines sentence. Miranda had already been jailed for approxi-

mately fourteen months at the time of his sentencing hearing and counsel argued that he should be released to serve the remainder of his time in a halfway house, where he could continue his mental health treatment.[4] Counsel noted that Miranda suffered from severe mental illness and that his mental illness was a substantial factor in committing his crime. Counsel argued that because Miranda was mentally ill and had little control over himself at the time he committed the crime, he warranted a lower sentence in terms of deterrence, incapacitation, and desert. Counsel also noted that Miranda immediately acknowledged his offense and made a proffer to the government. The government argued that Miranda's case was no different from those the court saw on a weekly basis, "where you have a defendant who is suffering from some mental infirmity, also has a history of drug use and was in fact under the influence of drugs at the time of the offense." R. 68-1, at 33. The government also argued that because Miranda heard command hallucinations, he was a danger to himself (and others) and should be incapacitated through imprisonment to protect him from himself.

It is unclear from the record whether the court accepted Dr. Yohanna's opinion that Miranda suffers from Schizoaffective Disorder. The court noted that although Miranda pled guilty and admitted knowingly committing the crime, Miranda "is basically stating that the alleged voices in his head caused his actions and has produced a psychiatric report in support of his contention that he was suffering from auditory hallucinations at the time of the bank robbery." R. 68-1, at 38. The court found that

---

[4] Dr. Yohanna testified that the University of Chicago was prepared to accept Miranda as a patient for the treatment of schizophrenia, and would also refer him to a drug program to address his addictions. R. 68-1, at 21.

Miranda "understood the nature of his crime and was aware that he was committing the crime and therefore he should be held accountable for his conduct." R. 68-1, at 39. The district judge stated that he respected Dr. Yohanna's expertise and testimony and noted that Dr. Yohanna had characterized the auditory hallucinations as "a contributing factor." The court agreed with the government's contention that Miranda was disguised, prepared a note and did not act on a quick impulse. Bank robbery is a serious crime, the court noted, and the crime caused great emotional distress to those present and could have resulted in injury to the public. The court also found the stability of our banking institutions to be an important factor in sentencing Miranda:

> The punishment I'm imposing is a just punishment for such a serious offense involving the safety of the public and the stability of banking institutions. The sentence I'm imposing will also prevent the defendant from committing future bank robberies because he will be confined. The sentence will also serve as a warning to others who contemplate committing a bank robbery.

R. 68-1, at 40. The court concluded that the public would be protected from Miranda and that Miranda would be protected from himself if he were imprisoned. The court therefore sentenced Miranda to fifty months' imprisonment, four months longer than the government had requested. Miranda appeals.

## II.

On appeal, Miranda contends that the court failed to consider his non-frivolous arguments regarding deterrence, desert and incapacitation in relation to the largely uncontested evidence that Miranda was suffering from delusions

and auditory hallucinations at the time he committed the crime. Miranda also argues that the court failed to consider his claim that his criminal history category overstated the seriousness of his prior criminal conduct. Finally, Miranda contends that the district court gave weight to protecting Miranda from himself when determining the length of his sentence, a factor that goes beyond the bounds of appropriate sentencing considerations.

In sentencing a defendant, the district court is obliged first to calculate the correct advisory guidelines range and then to decide whether to impose a sentence within the range or outside of it. *United States v. Robinson*, 435 F. 3d 699, 700-01 (7th Cir. 2006). The court must apply the factors set forth in 18 U.S.C. § 3553(a) in determining whether to apply a sentence within the advisory guidelines range. *Robinson*, 435 F.3d at 701. Several of those factors are very relevant to Miranda's case and we will therefore address them in some detail. The statute reads, in relevant part:

> (a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for the sentence imposed—
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > >
> > > (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a). Although the guidelines are treated as advisory after *Booker*, the application of section 3553(a) is mandatory. *United States v. Booker*, 543 U.S. 220, 261-63 (2005); *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005) "The sentencing judge cannot, after considering the factors listed in that statute, import his own philosophy of sentencing if it is inconsistent with them." *Dean*, 414 F.3d at 729. We review a sentence for reasonableness, and we may accord a sentence that is within the guidelines a presumption of reasonableness. *Rita v. United States*, 127 S. Ct. 2456, 2459 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). That presumption is not binding, however, and it applies only on appellate review. *Rita*, 127 S. Ct. at 2463. The district court judge "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," but must instead subject the "defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 127 S. Ct. at 2465. As a matter of process, the Supreme Court stated in *Rita*, the district judge will normally begin by considering the PSR and its interpretation of the guidelines, and then hear arguments by the prosecution and defense that a guidelines sentence should not apply, perhaps because the case falls outside the heartland of the guidelines, or because a guidelines sentence fails to reflect the section 3553(a) factors, "or perhaps because the case warrants a different sentence regardless." *Rita*, 127 S. Ct. at 2465. *See also United States v. Wallace*, 458 F.3d 606, 609 (7th

Cir. 2006) (on appellate review of a sentence, the procedural inquiry focuses on the actual reasons given, not on whether the sentence could have been supported by a different rationale).

Miranda first contends that the district court failed to consider or make findings with respect to the psychiatric evidence and its relevance under the section 3553(a) factors. Miranda also argues that when the court did mention Miranda's mental illness, the court did not discuss how that illness related to the section 3553(a) factors and instead substituted its own ideas about mental illness. When a defendant challenges a within-guidelines sentence as unreasonable, the judge must explain why the sentence imposed is appropriate in light of the section 3553(a) factors. *Robinson*, 435 F.3d at 701; *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005). A judge need not comment on every argument the defendant raises. "[A]rguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence." *Cunningham*, 429 F.3d at 678. But when a court gives little or no attention to the defendant's principal argument when that argument "was not so weak as not to merit discussion," we cannot have confidence that the judge adequately considered the section 3553(a) factors. *Cunningham*, 429 F.3d at 679. "[I]f anyone acquainted with the facts would have known without being told why the judge had not accepted the argument," then the judge need not specifically comment on that argument. *Id.* Such was not the case here. Anyone acquainted with the facts of Miranda's well-documented mental health history would not know why the district court rejected his arguments for a lesser sentence unless the court commented on its reasons.

Miranda's severe mental illness (and in particular his diagnosis of Schizoaffective Disorder) is a recognized ground for departing from the normal guidelines range.

Sentencing Guideline 5K2.13 recognizes diminished capacity as a ground for a downward departure.[5] *Cunningham*, 429 F.3d at 679. The concept of departures has been rendered obsolete in post-*Booker* sentencing but the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors. *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005); *United States v. Castro-Juarez*, 425 F.3d 430, 434-46 (7th Cir. 2005). If the district court fails to comment on a ground of recognized legal merit that is supported by a factual basis, "it is likely to have committed an error or oversight." *Cunningham*, 429 F.3d at 679.

In relating his diminished capacity to the section 3553(a) factors, Miranda argued to the district court that his mental illness (1) reduced the need for deterrence; (2) made incapacitation by imprisonment less appropriate;

---

[5] Guideline 5K2.13 provides, in whole:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

and (3) rendered him less deserving of punishment. Although the district court mentioned Miranda's mental illness, the court did not specifically address Miranda's principal, non-frivolous arguments based on these section 3553(a) factors, and we therefore are not confident that the court gave these arguments adequate consideration. Dr. Yohanna stated that Miranda's schizophrenia was the "predominant disease" driving him at the time he committed the bank robbery. Although his drug use could have contributed by reducing his inhibitions, Dr. Yohanna concluded that the command hallucinations were the primary or predominant cause of Miranda's behavior.[6] Dr. Yohanna also noted that, with appropriate medication and therapy, Miranda's illness was treatable and Miranda was coming to understand that the voices he heard were not real but were the result of a brain disease. The district court stated that it respected Dr. Yohanna's expertise and testimony but it is unclear whether and to what extent the court credited that testimony.

Under section 3553(a)(2), the primary purposes of a criminal sentence are to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes by the defendant, and to provide the defendant with needed training, medical care or correctional treatment in the most effective manner. *See also United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (the principal objectives of criminal punishment that guide the design

---

[6] Dr. Yohanna noted that Miranda continued to have auditory hallucinations and delusions long after his drug use ceased, indicating that the schizophrenia and not the drug use was the cause of the hallucinations and delusions.

and application of the sentencing guidelines are retribution, deterrence, and incapacitation). Mental illness, we noted in *Dyer*, might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant general deterrent effect on persons in the defendant's class. 216 F.3d at 570. It is difficult to see how a person experiencing auditory command hallucinations would be deterred by the threat of a heavy sentence, for example. On the other hand, a heavy sentence would have a general deterrent effect on persons who are not mentally ill. As for specific deterrence, it is for the district court to decide in the first instance whether a heavy sentence is necessary to deter Miranda from committing further crimes. The court may decide that Miranda, after being treated for mental illness, is not inclined to commit crimes and so does not require the added encouragement of a lengthy sentence. Or the court may come to the opposite conclusion if it determines that Miranda remains a threat even after treatment. In either case, the court must decide the applicability of specific deterrence on the facts before the court.

If the mental illness is treatable, as is the case with Miranda, the goal of incapacitation may not be advanced by a heavy sentence. *Dyer,* 216 F.3d at 570. Instead, mental health treatment would "incapacitate" Miranda from committing further crimes. In this case, there is evidence that Miranda was being treated for mental illness at the time he committed his crimes, and so the court may determine that the only way to truly incapacitate Miranda is a heavy prison sentence. On the other hand, there is also some evidence that Miranda was not correctly diagnosed or appropriately treated until his imprisonment for this crime. The district court may decide, if it credits Dr. Yohanna's testimony that Miranda has improved under his current treatment regime, that

Miranda is not a further threat, and that the goal of incapacitation is not served well by lengthy imprisonment.

Finally, a person who would not have committed a crime but for his mental illness would be less deserving of punishment because he is "not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired." *Dyer*, 216 F.3d at 571. Dr. Yohanna testified that the primary or predominant force driving Miranda at the time of the crime was mental illness. Dr. Yohanna also acknowledged that Miranda's drug use could have reduced his inhibitions. It is unclear whether the district court credited this testimony.

Miranda advanced all of these arguments, all of which were supported by Dr. Yohanna's report and testimony, none of which were seriously challenged factually by the government, and the district court did not address them. Under *Cunningham*, because we cannot be confident that the judge considered these arguments, we must vacate and remand for resentencing. Because we are vacating and remanding, we will address Miranda's other arguments.

Miranda contends that the district court substituted its own ideas about mental illness on those occasions that the court did address Miranda's schizoaffective disorder. There is some support in the record for this contention. For example, the district court stated that Miranda "understood the nature of his crime and was aware he was committing the crime." We note first that Dr. Yohanna offered no opinion as to whether Miranda understood the nature of his crime *at the time he committed it.* Dr. Yohanna opined only that Miranda *now* understands the nature of his crime. We find no factual basis in the record supporting a conclusion about what Miranda understood at the time of the crime except that at that time, he believed the voices he heard were real and were

commanding him to engage in certain acts.[7] The court also concluded that Miranda was disguised, had prepared a note and was not acting on impulse. Whether a baseball hat and sunglasses constitute a disguise is debatable—Miranda's wife immediately recognized him from the newspaper photo of the bank robber—but assuming that this was a disguise and that Miranda did engage in some planning, there is no indication in the record that this sort of behavior is inconsistent with psychotic delusions and auditory hallucinations. The court seems to have been considering whether Miranda met the legal standard for insanity at the time of the crime. But Miranda has never argued that he was legally insane and in fact pled guilty to the crime. Rather, Miranda argued that his mental illness was a significant factor in committing the crime and warranted lesser punishment under the section 3553(a) factors. That sentencing argument under section 3553(a) is what the district court did not address and must address on remand.[8]

The court also did not address Miranda's argument that his criminal history category substantially over-represented the seriousness of his prior criminal history and the risk of recidivism. Section 4A1.3(b)(1) of the guide-

---

[7] According to his medical records, Miranda had seen a psychiatrist five days prior to the robbery, complaining about hearing voices, including hearing commands to hurt himself.

[8] The government argued at sentencing that further imprisonment was appropriate in part because Miranda was a danger to himself, and the court indicated in sentencing Miranda that imprisonment would protect Miranda from himself. The government now concedes that protecting a defendant from himself is not an appropriate sentencing consideration under section 3553(a). The district court should therefore not apply that reasoning on remand.

lines provides for a downward departure in such a case. The Introductory Commentary to guideline 4A1.1 explains that a defendant's record of past criminal conduct is directly relevant to the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). First, a defendant with a record of prior criminal behavior is more culpable than a first-time offender and thus deserving of greater punishment. Second, the goal of general deterrence dictates that "repeated criminal behavior will aggregate the need for punishment with each recurrence." U.S.S.G. Chapter 4, Part A, Introductory Commentary. Third, in terms of specific deterrence, repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

As we noted earlier, departures are obsolete but the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors. Moreover, section 3553(a) directs the court to consider the defendant's "history and characteristics." Miranda argued that his two prior convictions both arose out of his attempt to kill himself with a gun. He testified that his FOID card had expired, giving rise to the firearm possession charge. Of course, Miranda could not have renewed his FOID card because persons suffering from mental illness and persons who are addicted to narcotics are prohibited from owning firearms. When he was arrested on the gun charge, the officers found a small amount of cocaine on his person, giving rise to the second conviction. Dr. Yohanna testified that, in some cases, mentally ill persons start using illegal drugs to self-medicate, and that mental health problems affect a person's capacity to manage drug use. These convictions resulted in a criminal history category of III. The crux of Miranda's claim was that he was not an incorrigible criminal, purposely flouting the law on multiple occasions, but rather was a working man, with a wife and two

children, who would not have committed these crimes but for his mental illness. Dr. Yohanna's testimony provided some factual support for this argument. The district court, unfortunately, failed to state whether it credited Dr. Yohanna's testimony, and failed to state whether Miranda's criminal history category accurately reflected his culpability or likelihood of recidivism, among other things. The court may conclude that Miranda's criminal history category accurately reflects his culpability and the danger he poses for recidivism, given that he committed some of these crimes while being treated for mental illness. We do not mean to suggest a particular result, and nor do we minimize the dangerousness that a drug-addicted gun owner with serious mental illness poses.

When Miranda sought to enter evidence on the context of these two prior convictions, the district court repeatedly stated that it could not "revisit" or "look beyond" those convictions, apparently construing Miranda's argument as a collateral attack on the prior convictions. But Miranda was not collaterally attacking those convictions; rather, he was asking the court to consider an argument under section 3553(a)(1) that those convictions arose out of his mental health issues and that his criminal history category overstated both the seriousness of his prior conduct and the likelihood that he would commit further crimes. The district court is free to accept or reject that theory based on the evidence before it, using the factors set forth in section 3553(a)(1) and, by way of analogy, sections 4A1.3(b) and 5K2.13 of the guidelines. *Dean*, 414 F.3d at 730 (explicit fact-finding is required if contested facts are material to the judge's sentencing decision). *See also Dyer*, 216 F.3d at 570 ("If there is no connection between the defendant's mental condition and his crime, there is no basis for a punishment discount.").

In *Rita*, the Supreme Court stated that the sentencing judge "should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." 127 S. Ct. at 2468. The Court stated that, when the district court decides to impose a within-guideline sentence, a lengthy explanation is generally not required. 127 S. Ct. at 2468. When "the defendant or the prosecutor presents nonfrivolous reasons for imposing a different sentence, however, the judge will normally go further and explain why he has rejected those arguments. Sometimes the circumstances will call for a brief explanation; sometimes they will call for a lengthier explanation." *Rita*, 127 S. Ct. at 2468. The district court did not have the benefit of *Rita* at the time of sentencing Miranda. *Rita* clarified the need for a district court to explain its response to nonfrivolous arguments. *Rita* also explained that the presumption of reasonableness for a within-guidelines sentence applies only to appellate review and not to the district court's analysis. *Rita*, 127 S. Ct. at 2465. Much of the district court's discussion of the reasons for the court's choice of fifty months as Miranda's sentence applies to all cases of bank robbery and not to Miranda specifically; thus the discussion focuses almost exclusively on factors that are already built into the heartland of the guidelines. For example, the court commented that bank robbery puts the public at great risk and undermines the stability of our banking institutions. The court also commented that imprisoning Miranda would prevent him from committing crimes while in prison and would serve as a warning to others who contemplate robbing a bank. These statements are truisms, and are the general sorts of sentencing considerations that are worked into the standard guidelines sentence. *See Cunningham,* 429 F.3d at 679 (a rote statement that the judge considered all of the

relevant factors will not always suffice). None of these considerations are specific to Miranda. But Miranda advanced specific arguments regarding the effect of his mental illness on sentencing. Because Miranda raised nonfrivolous reasons to impose a different sentence, the district court must focus on the section 3553(a) factors as they apply to Miranda in particular. Although the government portrayed Miranda's case as "not that different from ones you see on a weekly basis where you have a defendant who is suffering from some mental infirmity," Schizoaffective Disorder is a rare condition, and the courts do not often encounter a person who has a documented history of auditory command hallucinations and delusions that predate any criminal conduct. We cannot tell from the district court's comments whether the court made that individualized analysis of Miranda's factually and legally supported sentencing arguments under section 3553(a). *Rita*, 127 S. Ct. at 2468; *Cunningham*, 429 F.3d at 679. *See also Wallace*, 458 F.3d at 610 (a sentence may be found to be unreasonable if it is so inadequately supported by the record that a writ must issue). We therefore vacate and remand for resentencing.[9]

VACATED AND REMANDED.

---

[9] The court appreciates the skillful representation provided to Miranda by his appointed counsel, Gareth G. Morris, and also appreciates the services of Professor Mark J. Heyrman, Director of the Mental Health Advocacy Project at the University of Chicago Law School, and law student Mark Bala, who assisted Mr. Morris in the preparation of the appellate briefs.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*